## Marquette Cement Manufacturing Company v. Treas Lumber Company.

(Decided May 5, 1933.)

WHEELER, WHEELER & SHELBOURNE for appellant.

E. L. COOPER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

This suit was brought by the appellant, Marquette Cement Manufacturing Company, hereinafter called the "cement company," to recover the sale price of two carloads of cement sold by it to the appellee, Treas Lumber Company, hereinafter called the "lumber company," in the year 1930. The lumber company by its answer admitted the debt but pleaded a counterclaim in a sum of $391.30, leaving a balance due the cement company of $74.14, for which it confessed judgment. By reply, the cement company controverted the grounds of the counterclaim, and on the issue thus formed, the case went to the jury, which found in accordance with the claims of the lumber company. From the judgment entered on that verdict, this appeal is prayed.

The main insistence of the cement company on this appeal is that the lower court erred in overruling its

motion for a peremptory instruction made at the close of the lumber company's case, it having been awarded the burden of proof, and renewed at the close of all the evidence in the case. In this, we think the cement company is correct. The counterclaim of the lumber company was based on the allegation that it was, during the years 1923 to 1930, inclusive, the exclusive dealer in Marshall county for the sale of the cement company's cement; that it had been established as such exclusive dealer through an express agreement and contract with the cement company, but that the cement company in violation of its contract and agreement establishing the lumber company as its exclusive agent had in 1929 sold directly to N. E. Stone, a road contractor, for the purpose of building a highway, 3,649 barrels of cement; that according to the terms of the contract establishing it as such exclusive agent, the cement company, when it sold directly to a customer as in the case of this Stone highway contract, was under the obligation to pay the lumber company 10 cents a barrel for all cement so sold, and it was for this 10 cents per barrel for the 3,649 barrels so sold to the Stone company that the lumber company sought judgment over against the cement company. There were some other items of a minor nature embraced in the counterclaim which were conceded by the cement company and hence are not noticed here. To establish the allegations of this counterclaim, so far as this express contract was concerned, the lumber company produced but one witness, its president and manager, Mr. Cliff Treas. After testifying that his company had been handling the products of the cement company since 1923, he was then asked:

"Q. Did you ever have any agreement with them about the sale of cement? If so, tell the jury what it was, what was said. A. I had none, my brother was manager at the time this business was accepted.

"Q. You have had no agreement since you have been in charge? A. No sir.

"Q. *There being no agreement,* tell the jury how you have handled their cement, to what extent you handled their cement, and upon what terms, and in what territory, and with whom, for them, you have had your dealings. (Italics ours.)

"A. I cannot give you the amount we have handled. I did not refresh my memory on that but we have handled their cement continuously to my certain knowledge since 1923. From 1923 to 1930, it was handled on a cash basis of ten cents per barrel cash discount and ten cents per barrel dealer's commission."

Thus we see that Mr. Treas did not even attempt to say that there was an express agreement establishing his company as the exclusive dealer or agent of the cement company in Marshall county, and of course he did not essay to give the terms of the agreement of which he knew not. The lumber company's counsel by that part of his question which we have italicized indicated how thoroughly he understood Mr. Treas' inability to testify concerning the express contract alleged in the counterclaim.

Nowhere else in the testimony of Mr. Treas do we find any evidence setting out the terms of an express contract or the fact that there was an express contract between his company and the cement company creating and establishing the lumber company as the exclusive agent of the cement company in Marshall county, or by which the lumber company was to be allowed a commission of 10 cents a barrel or of any other amount on cement sold by the cement company directly to the customer. To the argument that such contract was established by the fact that from 1923 to 1928 no cement was sold in Marshall county except through the lumber company, it may be said that such fact of itself establishes no exclusive agency since the failure to sell cement other than through the lumber company may have been caused by the fact that there was no other call for the cement company's cement. Indeed, the evidence of the cement company uncontradicted shows that the lumber company was handling the cement of other manufacturers as well as the cement of the cement company and during the years from 1923 to 1930 comparatively little cement of the cement company was bought even by the lumber company.

In 1928, a road was built in Marshall county known as the Egner's Ferry road. The cement company contracted directly with the contractor on this road for the cement which it used, and ultimately and after a controversy with the lumber company paid the lumber com-

pany 10 cents a barrel on the cement thus sold directly to that road contractor. How this came about is told in different fashions by the cement company and the lumber company. The cement company claims that the reason for the payment of this 10 cents a barrel to the lumber company was this: The road contractor had no place to store his cement, so the traveling salesman of the cement company who sold this cement arranged with the lumber company to permit the road contractor to store this cement in the lumber company's warehouse, in return for which this traveling salesman agreed that his company would pay the lumber company a warehousing fee of 5 cents a barrel and would further use his influence with the road contractor to get it to give to the lumber company the lumber contract on the road. The lumber company was to charge the road contractor an additional 5 cents a barrel for the warehousing privilege. Following this agreement, through the influence and help of this traveling salesman, the lumber company did get the lumber contract and the cement was stored in the warehouse of the lumber company. The cement company never questioned its liability for the 5 cents a barrel warehousing fee, but the lumber company insisted that it was entitled to the full 10 cents a barrel from the cement company, and it was about this additional 5 cents that the controversy raged, finally being settled by the cement company giving in and paying the 10 cents a barrel. On the other hand, the lumber company's explanation of this transaction is that while it is true the cement was warehoused in its warehouse and while it is true the traveling salesman of the cement company at least helped it to get the lumber contract, the 10 cents a barrel which it claimed on the cement sold the contractor was due it because the traveling salesman of the cement company came and told it that he would allow it this 10 cents a barrel because the cement had been sold directly to the customer. But even as to this, Mr. Treas testified that he relied, in his controversy with the cement company over this matter for his right to the 10 cents a barrel, not on any terms of the general agency contract which the lumber company had with the cement company, but on the specific agreement with this traveling salesman in this particular case. It is very difficult to understand why the lumber company would have to rely on the specific agreement of the traveling salesman in this

particular case if the terms of its general agency contract gave it this 10 cents a barrel. Mr. Treas admits that after the Stone contract was let in 1929 following the completion of the Egner's Ferry road and the settlement of the controversy growing out of it, his company never made any demand or claim for a commission on the cement sold Mr. N. E. Stone, although he does claim that he did make a mild inquiry about it and was told that none was due his company. Some 18 months after the Stone contract had been let and all controversies had been settled about the Egner's Ferry road and after a car of cement in the summer of 1929 had been bought and paid for, the lumber company in the latter part of 1930, and without apprising the cement company of its position in the matter, ordered the two carloads of cement, for which the present suit was brought, for the sole purpose of getting into debt to the cement company so as to assert locally a counterclaim for the alleged commission due on the Stone contract. There is an entire absence of proof to show any express contract on the part of the cement company establishing the lumber company as its exclusive agent or dealer in Marshall county or to show that the lumber company was entitled to 10 cents a barrel or any commission on cement sold in that county otherwise than through the lumber company, which being true, the court should have peremptorily instructed the jury to find against the counterclaim asserted by the lumber company.

For its failure so to do, the appeal prayed is granted, and the judgment is reversed for a new trial consistent with this opinion.